## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CLYDE DISEDARE,** | **CIVIL DOCKET** |
| **Plaintiff** | |
| | |
| **VERSUS** | **NO.  22-2680** |
| | |
| **SGT. COLTER BRUMFIELD, ET AL.,** | **SECTION: "E" (2)** |
| **Defendants** | |

## ORDER AND REASONS

Before the Court is a Motion for Appeal/Review of the Magistrate Judge's September 1, 2023 Order [1] ("Motion for Review" or "appeal") by Plaintiff Clyde Disedare[2]—an Order in which the Magistrate Judge denied Plaintiff's Motion for Finding of Spoliation under Rule 37(e)(2) of the Federal Rules of Civil Procedure (the "Rule 37(e) Motion").[3] Defendants Colter Brumfield, Randall Williams, Darryl Mizell, Kevin Luper (the "Defendant officers"), and the State of Louisiana through the Louisiana Department of Public Safety and Corrections (the "DPSC") (collectively referred to as the "Defendants") filed an opposition.[4] Plaintiff filed a reply in support.[5] For the reasons that follow, Plaintiff's appeal is **GRANTED IN PART** and **DEFERRED IN PART**.

## BACKGROUND

Plaintiff Clyde Disedare is incarcerated at Rayburn Correctional Center ("RCC"), where he was held at all times relevant to this action.[6] Defendants remaining in this case

---

[1] R. Doc. 80.

[2] R. Doc. 83.

[3] R. Doc. 46.

[4] R. Doc. 88. The Court dismissed claims against Defendant Miley Adams without prejudice on December 19, 2022. R. Doc. 13. The Court dismissed claims against Defendant Major Brian Brumfield without prejudice on May 18, 2023. R. Doc. 36. The Court dismissed claims against the DPSC on March 13, 2024. R. Doc. 101. However, upon Plaintiff's motion for reconsideration, the Court vacated in part the March 13 Order with respect to the dismissal of the DPSC, finding "[t]he Court has jurisdiction over Plaintiff's claims against the State of Louisiana through the DPSC" on April 8, 2024. R. Doc. 112 at p. 8.

[5] R. Doc. 92.

[6] R. Doc. 1-1 at pp. 1–3.

are the State of Louisiana through the DPSC and state correctional officers Brumfield, Williams, Mizell, and Luper (collectively, the "Defendants").[7] Plaintiff alleges that over a four-day period beginning on March 16, 2021, the Defendant officers, suspecting Plaintiff had stored contraband in his rectum, repeatedly ordered him to ingest laxatives, perform bowel movements in full restraints, submit to strip searches, and undergo x-rays while confined to a dry cell.[8] No contraband was found.[9]

On March 21, 2021, two days after his release from the dry cell back into the general prison population, Plaintiff filed a "request" through the RCC's Administrative Remedy Program (the "ARP"),[10] which is a method for raising inmate grievances concerning some aspect of their incarceration.[11] In the ARP, Plaintiff alleged the Defendants violated his constitutional rights by exercising excessive force against him and housing him in unsanitary conditions of confinement in "'Dry Cell #1,' solitary confinement, within the Sun Unit."[12] Plaintiff also stated in his ARP that the Defendant officers told him they based their suspicion that Plaintiff stored contraband in his rectum on video surveillance footage recorded on March 16, 2021 and a body scan of Plaintiff performed on that same day.[13] Plaintiff's representation that Defendants told him they based their suspicion on the March 16 video footage and body scan is consistent with an unusual occurrence report

---

[7] *Id.* at pp. 2–3.

[8] *Id.* at p. 3. Although the parties do not define "dry cell," the Court takes judicial notice that it is a cell without plumbing fixtures where prisoners are placed with the expectation that any contraband will be expelled.

[9] *Id.* at pp. 8–9.

[10] Plaintiff's ARP dated March 21, 2021 [hereinafter "March 21 ARP"], R. Doc. 46-13. As instructed by ARP Screening officer Cynthia Crain, Plaintiff resubmitted his ARP in a shorter format on April 2, 2021. *See* March 21 ARP, R. Doc. 46-13 at p. 2; Plaintiff's ARP dated April 2, 2021 [hereinafter "April 2 ARP"], R. Doc. 46-12.

[11] *Frequently Asked Questions*, LA. DEP'T OF PUB. SAFETY AND CORR., https://doc.louisiana.gov/public-programs-resources/frequently-asked-questions [https://perma.cc/B3MJ-YDR6] (last visited Mar. 14, 2024).

[12] April 2 ARP, R. Doc. 46-12 at p. 2.

[13] *See id.*

2

prepared by Defendant Williams on March 16, 2021 (the "March 16 UOR").[14] Shortly after Plaintiff filed the ARP, Plaintiff's counsel sent letters to RCC Warden Keith Bickham on April 3, 2021 and June 14, 2021 (the "letters to Warden Bickham"),[15] specifically requesting "'ALL videos and scans' be preserved along with any other electronic evidence 'for litigation purposes.'"[16]

On July 6, 2022, Plaintiff filed suit in Louisiana state court against the four RCC officers, the DPSC, and others, asserting claims under 42 U.S.C. § 1983 and Louisiana state tort law.[17] On August 16, 2022, the Defendants removed the case to this Court from the 22nd Judicial District Court for the Parish of Washington in the State of Louisiana.[18]

While proceeding in this Court, on September 14, 2022, Plaintiff propounded Interrogatory No. 2 to Defendants for information related to "any photographs, moving pictures, videotapes, measurements, or other descriptions of the incident scenes of this matter or of [Plaintiff] as it related to this matter."[19] In response to Interrogatory No. 2, Defendants provided two video exhibits dated March 16, 2021 from cameras identified as "Wind 3 Dorm Rear" and "Wind 3 TV Room" and stated that "at this time the Defendants are unaware of, and have been unable to locate, any other such videos, photographs, or

---

[14] Unusual Occurrence Report prepared by Defendant Randall Williams, dated March 16, 2021 [hereinafter "March 16 UOR"], R. Doc. 46-3 at p. 6.

[15] R. Doc. 46-7 at pp. 5, 6, & 17.

[16] R. Doc. 46-2 at p. 4 (citing Plaintiff's Requests for Admissions to Defendants, R. Doc. 46-7 at pp. 3, 5). Defendants denied "Plaintiff's requests for admissions regarding the faxes [of letters to Warden Bickham] . . . for lack of information" and claim "there is no evidence that Warden Bickham physically received the faxes." R. Doc. 88 at pp. 2–3. However, Defendants do not deny the faxes were received by RCC and/or DPSC personnel, nor do they claim the letters were sent to the improper fax number or email address. *See* Defendants' Reponses to Plaintiff's Second Set of Requests for Admissions, Interrogatories and Production of Documents, dated May 18, 2023 [hereinafter "Defendants' Second Discovery Responses"], R. Docs. 92-1 (the DPSC's response), 92-2 (Defendant Luper's response), & 92-3 (Defendant Williams' response).

[17] R. Doc. 1-1 at p. 1.

[18] R. Doc. 1.

[19] R. Doc. 46-2 at p. 3 (citing Defendants' Response to Plaintiff's First Set of Interrogatories, dated March 8, 2023 [hereinafter "Defendants' First Discovery Response"], R. Doc. 46-4 at pp. 1–2).

other such media that depict the incident or scenes related to this matter other than that which has been attached to this answer."[20] On April 25, 2023, Plaintiff filed a motion to compel seeking the production of "all scans and video records taken on March 16."[21] On May 17, 2023, Magistrate Judge Donna Currault granted in part Plaintiff's motion to compel (the "May 17 Order"), ordering Defendants to "undertake a conscientious and reasonable effort to locate responsive information . . . and produce any additional videotapes responsive to [Interrogatory No. 2] within twenty-one days."[22] Complying with the May 17 Order, Defendants submitted to Plaintiff a supplemental response to Interrogatory No. 2 on June 6, 2023.[23] In the supplemental response, Defendants claimed that "[a]fter taking a conscientious and reasonable effort to locate any additional videos, no other videos apart from the two surveillance videos previously produced were located."[24] The Defendants did produce ten additional body scan images with Plaintiff's inmate identification number on them, taken on March 16, 17, and 19, 2021.[25]

On July 18, 2023, Plaintiff filed a Rule 37(e) Motion seeking "an adverse-inference sanction and attorney[s'] fees for the spoliation of both video and body scans," which was referred to Magistrate Judge Currault.[26] In his motion, Plaintiff alleged the Defendants "failed to produce all relevant video material and body scans dispositive in this case."[27] Specifically, Plaintiff claimed the Defendants failed to preserve evidence because they did not produce video footage of his March 16 walk to the Sun Unit and video footage from

---

[20] *Id.* (citing Defendants' First Discovery Response, R. Doc. 46-4 at p. 2).
[21] *See* R. Doc. 21.
[22] R. Doc. 35 at pp. 12–13.
[23] Defendants' Third Supplemental and Amended Responses to Plaintiff's First Set of Interrogatories, dated June 6, 2023 [hereinafter "Defendants' Supplemental Discovery Response"], R. Doc. 46-5.
[24] *Id.* at pp. 2–3.
[25] *Id.*
[26] R. Doc. 46-2 at p. 1.
[27] *Id.*

three surveillance cameras in the Wind 3 Dorm, and further claimed "the one relevant video [from Wind 3 Dorm Rear that was produced] was *cut off* on the backside to *exclude relevant video*."[28] Concerning the body scans, Plaintiff claimed Defendants "falsely represented" that the scans they produced that were performed on March 16, 2021 (the "March 16 body scans") were of Plaintiff.[29] Specifically, Plaintiff claimed the March 16 body scans, "while labeled and produced as those of [Plaintiff,] are of other unknown persons."[30] Defendants opposed the motion, arguing Plaintiff failed to satisfy his burden for a finding of spoliation because: (1) Defendants had no duty to preserve video footage from cameras that did not record relevant events and during times when there were no alleged issues (i.e., the Plaintiff's walk to the Sun Unit); (2) Plaintiff did not establish the Defendants acted in bad faith; and (3) the Defendant officers did not have custody or control over the video allegedly spoliated.[31]

On September 1, 2023, the Magistrate Judge denied Plaintiff's Rule 37(e) Motion (the "September 1 Order").[32] Plaintiff now appeals the September 1 Order.[33]

## LEGAL STANDARDS

### I.   Standard of Review on Appeal

Pursuant to Federal Rule of Civil Procedure 72(a) and Local Rule 72.2, non-dispositive pretrial matters decided by a magistrate judge may be appealed to a district judge.[34] A magistrate judge is afforded broad discretion in resolving non-dispositive

---

[28] *Id.* at pp. 5–6.

[29] *Id.* at p. 4.

[30] *Id.* To illustrate this point, Plaintiff suggests the Court compare the March 16 body scans to those from March 19, 2021, which Plaintiff admits are of his body. *Id.* Plaintiff claims "major difference[s] in build and other areas (circumcision versus uncircumcised) as well as clothing" are apparent between the scans. *Id.* at pp. 4–5. The Court agrees. The March 16 body scans are not of the Plaintiff.

[31] *See* R. Doc. 67.

[32] R. Doc. 80.

[33] R. Doc. 83.

[34] FED. R. CIV. P. 72(a); L.R. 72.2.

pretrial motions.[35] The order of a magistrate judge may be reversed only "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."[36] In order to meet this high standard, the district judge must be "left with a definite and firm conviction that a mistake has been committed."[37] A legal conclusion is contrary to law "when the magistrate fails to apply or misapplies relevant statutes, case law, or rules of procedure."[38]

"For issues that are committed by law to a judge's discretion, such as the resolution of discovery disputes, the magistrate's rulings are reviewed for abuse of discretion."[39] "[A] court by definition abuses its discretion when it applies an incorrect legal standard."[40] Decisions applying an incorrect legal standard are reviewed de novo.[41]

## II.    Standard for Sanctions Under Rule 37(e)

Rule 37(e) of the Federal Rules of Civil Procedure governs sanctions for a party's failure to preserve electronically stored information ("ESI").[42] Rule 37(e) was adopted in 2006 and "substantially amended in 2015."[43] "The amended version governs all civil cases commenced after December 1, 2015."[44] Rule 37(e) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take

---

[35] *McCallon v. BP Am. Prod. Co.*, 05–0597, c/w 05–0700, 2006 WL 3246886, at *2 (E.D. La. Nov. 8, 2006).
[36] 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).
[37] *Yelton v. PHI, Inc.*, 284 F.R.D. 374, 376 (E.D. La. 2012) (internal quotation marks omitted).
[38] *Energy Intelligence Grp., Inc. v. Canal Barge Co.*, 12-2107, 2014 WL 201698, at *1 (E.D. La. Jan. 17, 2014) (citations omitted).
[39] *Id.* (citations omitted). *See also Territa v. Oliver*, 11-1830, 2013 WL 6490338, at *1 (E.D. La. Dec. 10, 2013); *Kiln Underwriting Ltd. v. Jesuit High Sch. of New Orleans*, 06-4350, 2008 WL 4724390, at *1 (E.D. La. Oct. 24, 2008); *Bolding v. C.I.R.*, 117 F.3d 270, 273 (5th Cir. 1997).
[40] *Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699, 701 (5th Cir. 2011) (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)); *see also Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing *Koon v. United States*, 518 U.S. 81, 100 (1996)).
[41] *Klier*, 658 F.3d at 474.
[42] Fed. R. Civ P. 37(e); *see also Grant v. Gusman*, 17-2797, 2020 WL 1864857, at *8 (E.D. La. June 17, 2021); *Falkins v. Goings*, 21-1749, R. Doc. 42 at p. 8 (E.D. La. Oct. 24, 2022); *Jim S. Adler, P.C. v. McNeil Consultants, LLC*, 19-2025, 2023 WL 2699511, at *8 (N.D. Tex. Feb. 15, 2023).
[43] *Grant*, 2020 WL 1864857, at *8 (citing *Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 490 (N.D. Tex. 2016)).
[44] *Id.* (citing *Trombetta*, 178 F. Supp. 3d at 490).

reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

>> (A) presume that the lost information was unfavorable to the party;

>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

>> (C) dismiss the action or enter a default judgment.[45]

Thus, "[t]he four predicate elements [that] must exist" before a court may sanction a party for lost ESI are: "(1) the ESI should have been preserved;" (2) the ESI was lost; "(3) the lost ESI resulted from a party's failure to take reasonable steps to preserve it; and (4) the lost ESI cannot be restored or replaced through additional discovery."[46]

Under Rule 37(e)(1), once the four predicate elements are satisfied and upon a finding of prejudice, the court may "order measures no greater than necessary to cure the prejudice."[47] However, under Rule 37(e)(2), the court may impose more burdensome sanctions if the party who lost the ESI "acted with the intent to deprive another party of the information."[48] Potential sanctions under Rule 37(e)(2) include: a presumption that the lost information was unfavorable to the party, an instruction to the jury that it may or

---

[45] FED R. CIV P. 37(e).

[46] *Grant*, 2020 WL 1864857, at *8 (citing *Flores v. AT&T Corp.*, 17-318, 2018 WL 6588586, at *4 (W.D. Tex. Nov. 8, 2018)); *see also Falkins*, 21-1749, R. Doc. 42 at p. 8.

[47] FED R. CIV P. 37(e)(1).

[48] FED R. CIV P. 37(e)(2). The 2015 Advisory Committee Notes to Rule 37(e)(2) counsel that even if a court finds such "an intent to deprive another party of the lost information's use in litigation," the court may impose "lesser measures such as those specified in [subsection] (e)(1) [if those measures] would be sufficient to redress the loss." FED. R. CIV. P. 37(e), Advisory Comm. Notes, 2015.

must presume same, or dismissal of the action or entry of a default judgment.[49] The presumption that lost information was unfavorable to the destroying party "derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction."[50] Accordingly, to restore the prejudiced party to its position had the ESI not been lost, an adverse inference may be imposed to "plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk."[51] "The party alleging spoliation bears the burden of proof."[52]

## LAW AND ANALYSIS

In deciding Plaintiff's Rule 37(e) Motion, the Magistrate Judge did not apply the legal standard prescribed by Rule 37(e) for failure to preserve ESI.[53] The electronically stored video surveillance footage and body scan images at issue in this case are included within the definition of ESI.[54] Instead, Magistrate Judge Currault applied the common law requirements for a finding of spoliation and adverse inference instruction for *non-ESI* evidence,[55] described by her as:

    (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed;

    (2) the evidence was [intentionally] destroyed with a culpable state of mind; and

---

[49] FED. R. CIV. P. 37(e)(2).
[50] *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).
[51] *Id.* (quoting *Nation-Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1982)).
[52] *Grant*, 2020 WL 1864857, at *8.
[53] *See* R. Doc. 80 at p. 4.
[54] *See, e.g., Falkins v. Goings*, 21-1749, 2022 WL 17414295 (E.D. La. Dec. 5, 2022); *Autin v. La. Dep't of Pub. Safety & Corr.*, 20-1214, R. Doc. 61 (E.D. La. June 17, 2021).
[55] For example, Magistrate Judge Currault relied on *Coastal Bridge Company, L.L.C. v. Heatec, Inc.*, 833 Fed. App'x 565 (5th Cir. 2020), in which the spoliation at issue involved the scene of a fire and the replacement of parts of a heater. R. Doc. 80 at p. 4.

      (3) the destroyed evidence was 'relevant' to the party's claim or defense such
           that a reasonable trier of fact could find that it would support that claim
           or defense.[56]

The Magistrate Judge ultimately found Plaintiff failed to satisfy his burden under that legal standard and denied his Rule 37(e) Motion.[57] In reaching this conclusion, the Magistrate Judge first determined Plaintiff did not demonstrate the four individual Defendant officers had a duty to preserve the destroyed evidence because they did not establish that they "controlled the facility's video records retention policies or were involved in the destruction of any video evidence" or body scans.[58] Second, the Magistrate Judge found Plaintiff did not establish "the evidence was destroyed with a culpable state of mind."[59] Third, the Magistrate Judge determined Plaintiff failed to establish the relevance of the allegedly spoliated video footage and body scans.[60]

     On appeal, Plaintiff objects to Magistrate Judge Currault's September 1 Order.[61] Plaintiff misstates the standard of review in this case by citing the standard used for non-dispositive pretrial motions, "clearly erroneous and contrary to law."[62] The September 1 Order resolves a motion for sanctions in a discovery dispute, which is an issue "committed to a magistrate judge's discretion" that this Court will reverse only for an abuse of discretion.[63]

---

[56] *See id.*

[57] *Id.* at p. 8.

[58] *Id.* at p. 5.

[59] *Id.* at pp. 7–8. Judge Currault determined "[i]t would appear as though there was an error when inputting the Sallyport scans with regard to Plaintiff's March 16, 2021 scans[,] [and] [s]uch negligence, . . . falls short of the required culpable stat of mind." *Id.* at p. 8.

[60] *Id.* at p. 8. Judge Currault determined "the relevance of the three destroyed video camera [footage] [] is questionable given the camera angles at issue," and found "[s]imilarly, in light of Plaintiff's receipt of the March 17 and 19, 2021 Sallyport images, which show nothing lodged in Plaintiff's rectum, additional scans showing no obstruction on an earlier date would simply be cumulative of that evidenced by Plaintiff's later images," as the March 16 scans were collected before Plaintiff was forced to perform bowel movements. *Id.*

[61] R. Doc. 83-2.

[62] *Id.*; *see also* FED. R. CIV. P. 72(a).

[63] *See Falkins*, 2022 WL 17414295, at *3.

Rule 37(e) provides the appropriate inquiry for allegations of a party's failure to preserve ESI that should have been preserved, like the video footage and body scans underlying Plaintiff's Rule 37(e) Motion.[64] Rather than applying the standard prescribed by Rule 37(e), the Magistrate Judge applied common law legal standards for spoliation and adverse inference instruction based on spoliation of non-ESI evidence.[65] Because the Magistrate Judge applied the incorrect legal standard in the September 1 Order, the court "by definition[,] abuse[d] its discretion."[66] Accordingly, this Court reviews Plaintiff's Rule 37(e) Motion de novo.[67]

## I.     Plaintiff established the four predicate elements of Rule 37(e).

As discussed, "Rule 37(e)'s plain language dictates that four predicate elements must exist before a federal district court may sanction a party for lost ESI."[68] The party alleging an adversary should have preserved ESI has the burden to prove: "(1) the existence of ESI that should have been preserved;" (2) the ESI was lost; "(3) the lost ESI resulted from a party's failure to take reasonable steps to preserve it; and (4) the lost ESI cannot be restored or replaced through additional discovery."[69]

> ### A. The ARP and the April 3 letter to Warden Bickham put Defendants on actual notice, before the 30-day automatic overwrite, that all body scans of Plaintiff and video footage from all the cameras in the Wind 3 Dorm and of his walk to the Sun Unit were ESI that should be preserved.

Generally, a party to litigation has a duty to preserve evidence once "the party has notice that the evidence is relevant to the litigation or should have known that the

---

[64] FED R. CIV P. 37(e); *see also Grant*, 2020 WL 1864857, at *8; *Falkins*, 2022 WL 17414295, at *3.
[65] R. Doc. 80 at p. 4.
[66] *See Benavides*, 636 F.3d at 701.
[67] *See Klier*, 658 F.3d at 474.
[68] *Grant*, 2020 WL 1864857, at *9.
[69] *Id.*

evidence may be relevant."[70] Such a duty does not exclusively arise during litigation but extends to "the period before litigation when a party knew or should have known that litigation was imminent."[71] However, the potential for litigation "does not obligate a[] [party] to 'preserve every shred of paper, every e-mail or electronic document, and every backup tape.'"[72] Instead, "Rule 37(e) specifically focuses on relevant ESI that should have been preserved 'in the anticipation or conduct of litigation.'"[73] "Federal Rule of Evidence 401 provides that evidence is relevant if: '(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" [74] In other words, the duty to preserve "extends to . . . information that is relevant to the claims and defenses of any party, or which is 'relevant to the subject matter involved in the action.'" [75] "This duty of preservation extends to all employees likely to have information relevant to the litigation, who are regarded as 'key players' in the litigation."[76]

Plaintiff argues Defendants were "under an obligation to preserve . . . at the time of destruction" video footage from all the Wind 3 Dorm cameras and from his March 16 walk to the Sun Unit, and all body scans of Plaintiff.[77] Defendants produced two video exhibits from cameras identified as "Wind 3 Dorm Rear" and "Wind 3 TV Room,"[78] and a

---

[70] *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015); *see Grant*, 2020 WL 1864857, at *9. Rule 37(e) "does not create a new duty; instead, it is based on a common law duty to preserve relevant information when litigation is reasonably foreseeable, so courts should consider whether and when the duty to preserve arose." *Falkins*, 2022 WL 17414295, at *3 (citing FED R. CIV P. 37(e), Advisory Comm. Notes, 2015).

[71] *Dixon v. Greyhound Lines, Inc.*, 13-179, 2014 WL 6087226, at *2 (M.D. La. Nov. 13, 2014).

[72] *Mixon v. Pohlman*, 20-1216, 2022 WL 2867091, at *5 (E.D. La. July 21, 2022) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)).

[73] *Grant*, 2020 WL 1864857, at *9 (citing FED R. CIV P. 37(e)).

[74] *Id.* (citing FED. R. EVID. 401).

[75] *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006) (quoting *Zubulake*, 220 F.R.D. at 218).

[76] *In re Bertucci Contracting Co., L.L.C.*, 2014 WL 5483707 (E.D. La. Oct. 29, 2014) (citing *Consolidated Aluminum Corp.*, 244 F.R.D. at 339).

[77] R. Doc. 46-2 at p. 8.

[78] *Id.* at p. 3 (citing Defendants' First Discovery Response, R. Doc. 46-4 at p. 2).

total of ten body scan images purported to be taken of Plaintiff on March 16, 17, and 19, 2021.[79] Plaintiff claims the Defendants improperly failed to preserve March 16 video footage from his walk to the Sun Unit and from three other surveillance cameras in the Wind 3 Dorm[80] on that same day and Defendants misidentified the produced body scans from March 16 as being of Plaintiff when in fact they were "of other unknown persons."[81] Plaintiff contends Defendants' "duty to preserve the video was patent on the face" of the March 16 UOR,[82] the ARP, and the letters to Warden Bickham dated April 3 and June 14, 2021.[83] Specifically, Plaintiff attests the ARP gave "ample notice to retain all of the video and body scans"[84] and the letters to Warden Bickham requested "'ALL videos and scans' be preserved along with any other electronic evidence 'for litigation purposes.'"[85] Plaintiff further argues the ARP and the April 3 letter to Warden Bickham put Defendants on notice of Defendants' duty to preserve *before* the surveillance videos were automatically overwritten after 30 days per DPSC's document retention policy.[86]

In opposition, Defendants argue "[t]here was no reason to retain video from other [cameras] in the Wind 3 Dorm because Defendant Williams requested that the video he reviewed be retained"[87] and Plaintiff "never specifically requested any video from the walk area to Sun Unit."[88] Defendants contend "correctional facilities have [no] affirmative duty to preserve *all* video that an offender requests that they preserve," and even if they did,

---

[79] Defendants' Supplemental Discovery Response, R. Doc. 46-5 at pp. 2–3.
[80] R. Doc. 46-2 at pp. 5–6.
[81] *Id.* at pp. 4–5.
[82] March 16 UOR, R. Doc. 46-3 at p. 6.
[83] R. Doc. 46-2 at p. 8.
[84] R. Doc. 83-2 at p. 1.
[85] R. Doc. 46-2 at p. 4 (citing Plaintiff's Requests for Admissions to Defendants, R. Doc. 46-7 at pp. 3, 5).
[86] R. Doc. 46 at p. 10. *See also Falkins*, 21-1749, R. Doc. 42 at p. 13 (discussing the RCC's document retention policy); *Autin*, 20-1214, R. Doc. 61 at pp. 5–6 ("[The DPSC]'s policy expressly requires retention of video surveillance records for a period of thirty days.").
[87] R. Doc. 67 at p. 7 (citing Declaration of Randall Williams, R. Doc. 67-2).
[88] *Id.* at p. 3.

Plaintiff's ARP did not request that the RCC "specifically preserve any video of Wind 3 Dorm or the walk to Sun Unit."[89] The opposition further argues none of the Defendants "[we]re in charge of maintaining or had control of the evidence at issue," thus, "Plaintiff cannot meet his initial and requisite burden and any spoliation claims as to the individual Defendants fails as a matter of law."[90]

"[R]easonable notice of a party's duty to preserve evidence may arise when the plaintiff files a formal complaint, informs the defendant that he has retained counsel, threatens litigation, or requests information relevant to the incident."[91] Other courts in this district, specifically considering RCC inmates' claims that RCC officials should have preserved ESI, have found that the filing of an ARP is sufficient to trigger the duty to preserve.[92] For example, in *Autin v. Goings*, District Judge Ivan LeMelle found "Defendants had a duty to preserve . . . video footage upon receiving plaintiff's ARP, which served as a formal request to RCC officials to review his excessive force ARP complaint."[93] Similarly, in *Falkins v. Goings*, Magistrate Judge Janis van Meerveld considered whether an inmate's ARP created a duty to preserve evidence when the inmate asserted that video footage of the inmate's appearance and condition immediately prior to an alleged incident of excessive force "would show that his eyes were not swollen . . . and that he was able to walk without assistance."[94] Judge van Meerveld determined the plaintiff's ARP "should have put the defendants on notice of potential

---

[89] *Id.* at pp. 8–9 (citing March 21 ARP, R. Doc. 67-4).
[90] *Id.* at p. 13.
[91] *Autin*, 20-1214, R. Doc. 61 at pp. 5–6 (citing *Dixon*, 2014 WL 6087226, at *3; *Terral v. Ducote* 15-2366, 2016 WL 5017328, at *3 (W.D. La. Sept. 19, 2016); *English v. Wal-Mart Stores, Inc.*, 10-80, 2011 WL 3496092, at *5 (D. Nev. Aug. 10, 2011)).
[92] *See Autin*, 20-1214, R. Doc. 61 at p. 6; *Falkins*, 21-1749, R. Doc. 42 at p. 11 (finding "a duty to preserve relevant video showing . . . before and after the incident arose at the filing of the ARP").
[93] *Autin*, 20-1214, R. Doc. 61 at p. 6.
[94] *Falkins*, 21-1749, R. Doc. 42 at p. 11.

litigation, and . . . should have put the defendants on notice that video from before and after the incident . . . was relevant to the potential litigation."[95]

In this case, like the inmates' ARPs in *Autin* and *Falkins*, Plaintiff's ARP was sufficient to put the Defendants on notice of potential litigation and on notice that the body scans and video footage at issue should be preserved.[96] In the ARP, Plaintiff declared that he heard Defendant Williams tell the other Defendants that, while reviewing video footage, he saw "[Plaintiff] put something in his rectum . . . [w]ell I didn't see it, the locker was in the way, but that is what it looked like."[97] The allegation in Plaintiff's ARP is consistent with Defendant Williams' statements concerning what he saw in the video, as recorded in the March 16 UOR[98] and the transcript from his August 16, 2023 deposition.[99] The ARP further provides that, in response to Defendant Williams' allegation, Plaintiff replied: "You have got to be kidding me. I'd like to see that on camera."[100] Plaintiff's ARP submitted shortly after Defendants' allegedly improper actions expressed his explicit request to see video footage from all Wind 3 Dorm cameras and gave Defendants notice that Plaintiff disputed the evidentiary basis of their reasonable suspicion for detaining him in the dry cell.[101] Further, if there was any doubt as to Defendants' duty to preserve upon receipt of the ARP, Plaintiff's counsel promptly submitted her first letter to RCC

---

[95] *Id.*

[96] *See Autin*, 20-1214, R. Doc. 61 at p. 6; *Falkins*, 21-1749, R. Doc. 42 at p. 11.

[97] April 2 ARP, R. Doc. 46-12 at p. 1.

[98] March 16 UOR, R. Doc. 46-3 at p. 6 ("On March 16, 2021 while reviewing video footage from a previous incident, I observed Offender Clyde Disedare . . . reach[] his hand into the back of his jeans, as if he could be placing the object into his rectum.").

[99] Transcript of the Testimony of Randall Williams, dated August 16, 2023, R. Doc. 92-4 at p. 13, 43:7-11 ("I followed the video to Inmate Disedare, to - - wherever he went to his bed area, to the bed, and observed him place whatever he had just put in his pocket down the back of his pants into his rectum area.").

[100] March 21 ARP, R. Doc. 46-13 at p. 4.

[101] Plaintiff argues video footage from other Wind 3 Dorm cameras would show "it was absurd to suggest he had reached his hand down the back of his pant to his rectum and inserted an object while in a room with multiple other inmates and not one of them taking any notice." R. Doc. 83-2 at p. 9. Further, Plaintiff contends video footage from the other cameras would likely prove Plaintiff "returned to his bed, took [] tobacco out of his pocket and placed three cans in his locker and one in his pocket." R. Doc. 78 at p. 4.

Warden Bickham on April 3—18 days[102] after the March 16, 2021, incident—explicitly requesting "'ALL videos and scans' be preserved along with any other electronic evidence 'for litigation purposes.'"[103]

Accordingly, the Court finds the Defendants had notice that all body scans of Plaintiff from March 16 and all video footage related to the incident and Plaintiff's detention in the dry cell, including footage from all cameras in the Wind 3 Dorm and his March 16 walk to the Sun Unit, should have been preserved and Defendants had a duty to preserve such ESI in the course of this litigation.

### B. The body scans and video footage at issue were lost.

The parties do not dispute that some of the body scans and some of the video footage at issue were lost. Concerning the video footage at issue, Defendants admit "[a] total of two videos relative to this litigation currently exist[] [and] [b]oth videos were produced to Plaintiff."[104] These two videos were recorded on March 16, 2021 from cameras identified as "Wind 3 Dorm Rear" and "Wind 3 TV Room," which Defendants produced to Plaintiff on March 8, 2023.[105] Thus, by Defendants' admission that only these two videos exist, it is clear that the video evidence from Plaintiff's walk to the Sun Unit and from the three other cameras in the Wind 3 Dorm no longer exist. Concerning the body scans at issue, Plaintiff contends "the [March 16] body scans . . . are not those of [Plaintiff]."[106] Defendants admit "[e]ither Plaintiff was never scanned on March 16, 2021,

---

[102] RCC's document retention policy results in surveillance videos being automatically overwritten after 30 days. *See* R. Doc. 46 at p. 10. *See also Falkins*, 21-1749, R. Doc. 42 at p. 13 (discussing the RCC's document retention policy); *Autin*, 20-1214, R. Doc. 61 at pp. 5–6 ("[The DPSC]'s policy expressly requires retention of video surveillance records for a period of thirty days.").

[103] R. Doc. 46-2 at p. 4 (citing Plaintiff's Requests for Admissions to Defendants, R. Doc. 46-7 at pp. 3, 5).

[104] R. Doc. 67 at p. 2 (referring to video footage collected on March 16, 2021 from the Wind 3 TV Room and Wind 3 Dorm Rear).

[105] R. Doc. 46-2 at p. 3 (citing Defendants' First Discovery Response, R. Doc. 46-4 at p. 2).

[106] R. Doc. 83-2 at p. 5.

or Plaintiff was scanned and his scans were destroyed,"[107] however the March 16 UOR prepared by Defendant Randall Williams clearly states Plaintiff was in fact scanned on March 16.[108]

Because the parties agree that any body scan of Plaintiff from March 16 and all video footage of his March 16 walk to the Sun Unit and the three other cameras in the Wind 3 Dorm are lost, the Court finds, on the record, that they have been.[109]

### C. The body scans and video footage were lost because of Defendants' failure to take reasonable steps to preserve the ESI.

Rule 37(e) imposes a duty on parties to litigation "to take reasonable steps to preserve" ESI.[110] While Rule 37(e) "does not call for perfection," the 2015 Advisory Committee's notes instruct courts to "be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts."[111] Indeed, "some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation."[112] The Committee further advises courts to "be sensitive to party resources[,] [as] aggressive preservation efforts can be extremely costly, and parties (including governmental parties) may have limited staff and resources to devote to those efforts."[113] The Court has taken judicial notice of the DPSC's experience

---

[107] R. Doc. 88 at p. 3.
[108] March 16 UOR, R. Doc. 46-3 at p. 6 ("After the offender was scanned, an object could clearly be seen inside Offender Disedare's body. Col. Darryl Mizell was notified and also observed the object inside Offender Disedare. Per Deputy Warden Keith Bickham, Offender Disedare was escorted to Sun Unit and placed on Dry Cell.").
[109] *See, e.g.*, *Falkins*, 21-1749, R. Doc. 42 at p. 11 (finding video footage was lost when they "existed but were automatically overwritten"); *Jim S. Adler*, 2023 WL 2699511, at *18 ("The parties do not dispute that the [ESI] at issue in the Spoliation Sanctions Motion have been lost. And the Court finds, on this record, that they have been."); *Ringers Technologies LLC v. Harmer*, 18-4347, 2020 WL 6385813, at *6 (S.D. Tex. Aug. 17, 2020) ("As it is undisputed that the [ESI] wa[s] deleted, the second element of Rule 37(e) is met.").
[110] FED. R. CIV. P. 37(e).
[111] FED. R. CIV. P. 37(e), Advisory Comm. Notes, 2015.
[112] *Id.*
[113] *Id.*

defending against allegations that RCC officers improperly failed to preserve ESI.[114] Thus, the Defendants should be familiar with the preservation obligations that litigation imposes, and the Defendants do not argue that they are not. Further, while "preservation efforts can be extremely costly,"[115] Defendants' duty to preserve the video footage and body scans at issue was not onerous, especially given the small number of scans and videos requested from a narrow time period and Plaintiff's counsel's offer to "provide a jump drive to assist in the retention of this evidence."[116]

Specifically, concerning the March 16 body scans,[117] Defendants' failure to input Plaintiff's correct inmate identification number at the time the scans were generated constituted a failure to take reasonable steps to preserve that ESI.[118] Indeed, Defendants admit "it is possible that some of the body scans are not Plaintiff herein . . . [and] Defendants are unaware of how images of other inmates would appear following a search of Plaintiff's [identification] number." [119] Concerning the videos, Defendants acted unreasonably in failing to preserve all video footage and allowing it to be automatically overwritten. Plaintiff acknowledges the DPSC has a document retention policy which results in surveillance videos being automatically overwritten after 30 days.[120] However, as discussed, the ARP and the April 3 letter to Warden Bickham put Defendants on reasonable notice that video footage from Plaintiff's walk to the Sun Unit and all cameras in the Wind 3 Dorm should have been preserved for future litigation before the 30 days

---

[114] The Court is aware of three cases in which RCC inmates allege defendant officials failed to preserve video evidence that should have been preserved after a duty to preserve arose. *Autin v. Goings*, 20-1214 (E.D. La.); *Falkins v. Goings*, 21-1749 (E.D. La.); *McIntosh v. Goings*, 21-1719 (E.D. La.).

[115] *See* FED. R. CIV. P. 37(e), Advisory Comm. Notes, 2015.

[116] R. Doc. 78 at p. 2.

[117] Plaintiff claims four body scans were taken on March 16, 2021 and Defendants claim six were collected on that date. *Id.* at p. 7.

[118] *See* R. Doc. 67 at p. 4; R. Doc. 80 at p. 8.

[119] R. Doc. 67 at p. 4.

[120] R. Doc. 46 at p. 10.

ran. Like the inmate's ARP in *Falkins*, Plaintiff's ARP and the April 3 letter to Warden Bickham "w[ere] filed [and submitted] less than 30 days after the incident at a time when the videos should have been available."[121] Similarly, this Court finds Defendants' failure to take reasonable steps to preserve all video footage from the Wind 3 Dorm and Plaintiff's walk to the Sun Unit, after being put on notice that the evidence should be preserved, resulted in the loss of that ESI.[122]

Considering Defendants' familiarity with their duty to preserve ESI and the ease with which they could have preserved all body scans of Plaintiff from March 16 and all video footage from the three other cameras in the Wind 3 Dorm and Plaintiff's walk to the Sun Unit, the Court finds the Defendants failed to take reasonable steps to preserve the ESI at issue.

### D. The lost body scans and video footage at issue cannot be restored or replaced through additional discovery.

Finally, Rule 37(e) is applicable only when lost ESI "cannot be restored or replaced through additional discovery."[123] The 2015 Advisory Committee suggests that "[b]ecause [ESI] often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere."[124] In this case, neither party "proposed any alternative discovery that could replace" the lost ESI.[125] Regarding the lost video footage, in their supplemental response to Interrogatory No. 2, Defendants indicated that "[a]fter taking a conscientious and reasonable effort to locate any additional videos, no other videos apart from the two surveillance videos previously produced were located."[126]

---

[121] *Falkins* , 21-1749, R. Doc. 42 at p. 14.
[122] *See id.*
[123] FED. R. CIV. P. 37(e).
[124] FED. R. CIV. P. 37(e), Advisory Comm. Notes, 2015.
[125] *See Falkins*, 21-1749, R. Doc. 42 at p. 14.
[126] Defendants' Supplemental Discovery Response, R. Doc. 46-5 at pp. 2–3.

Further, in their opposition to Plaintiff's Rule 37(e) Motion, Defendants attest "[the] DPSC produced all of the body scans that resulted from a search of Plaintiff's [identification] number from the relevant period [and] . . . all images were produced out of an abundance of caution."[127]

Because the lost body scans and video footage are "irremediably lost[,] [as] they cannot be restored or replaced through additional discovery,"[128] the Court finds that Plaintiff satisfied the fourth predicate element of Rule 37(e).

## II.   Defendants' loss of the ESI caused prejudice to Plaintiff.

Rule 37(e)(1) requires a finding of prejudice before a court may order sanctions.[129] "A party suffers prejudice where it cannot present 'evidence essential to its underlying claim.'"[130] Thus, the prejudice inquiry turns on whether the party seeking sanctions can demonstrate the missing or altered evidence would have been relevant to proving a claim or defense.[131] "[L]ost or destroyed evidence is 'relevant' if a 'reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.'"[132]

Defendants argue the destroyed video footage was not relevant because the three other cameras in Wind 3 Dorm "either do not show Plaintiff's bed (Rack 10) or have views obstructed by columns and/or fans," and Plaintiff never made "any specific allegations that anything unusual occurred on the walk to Sun Unit other than [that] he was escorted

---

[127] R. Doc. 67 at p. 4.
[128] *See Borum v. Brentwood Village, LLC*, 332 F.R.D. 38, 46 (D.D.C. July 18, 2019).
[129] FED R. CIV P. 37(e)(1).
[130] *Coastal Bridge Company, L.L.C. v. Heatec, Inc.*, 833 Fed. App'x 565, 575 (5th Cir. 2020) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010)).
[131] *See id.*; *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011); *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010).
[132] *Victor Stanley, Inc.*, 269 F.R.D. at 531 (quoting *Thompson v. U.S. Dep't of Housing & Urban Dev.*, 219 F.R.D. 93, 101 (D. Md. 2003)).

to the Sun Unit."[133] Defendants further contend "[t]he video from Wind 3 [Dorm] Rear shows the best view of Plaintiff and his actions while in the dorm," claiming "at least one of the camera[s] [] would not have captured the Plaintiff's bed area and the other two [cameras] were at such a distance and had obstructions so that preservation would have added no value to the video already preserved and produced."[134] Regarding the body scans, Defendants argue "any missing scans are irrelevant because Plaintiff admits that something was visible in his abdomen *after* March 16, 2023."[135] However in his reply, Plaintiff asserts that, although he maintains "on March 18, 2021, the x-ray technologist advised [him] that he had crystals in his bladder, but no contraband in his rectum," he has "never testified or asserted that contraband was visible in his abdomen" and has "always taken the position that there was never any contraband in his rectum to be seen on a scanner."[136]

Plaintiff argues the lost scans and video footage are highly relevant because "[t]he entire defense of reasonable suspicion in this case revolves around" observations and inferences the Defendants made from this evidence, as stated in the March 16 UOR.[137] In the March 16 UOR, Defendant Williams stated he watched Plaintiff "receive something through the fence of Wind 3 [TV Room] and place the object into his pocket" on video footage from the Wind 3 TV Room camera, and then observed him "walk[] back to the bed area of Wind 3 [Dorm] to his bed and can be seen taking the object out of his pocket[,] . . . reach[] his hand into the back of his jeans, as if he could be placing the object

---

[133] R. Doc. 67 at pp. 3–4 (citing Photos of Wind 3 Dorm with arrows pointing to Rack 10, R. Doc. 67-3). In his reply, Plaintiff claims "[t]he photograph does not show where the beds were on the date of the incident and are not evidence of what could have been seen from the camera across from [Plaintiff's] bed" on March 16, 2021 because "the beds in the dorm are movable and not anchored to the floor." R. Doc. 78 at p. 5–6.
[134] R. Doc. 67 at p. 9.
[135] R. Doc. 88 at p. 3.
[136] R. Doc. 92 at pp. 6–8.
[137] R. Doc. 46-2 at pp. 1–2 (citing March 16 UOR, R. Doc. 46-3 at p. 6).

into his rectum."[138] According to the March 16 UOR, after Lieutenant Colonel Thomas Mitchell approved Plaintiff "to be scanned using the body scanner in the Sallyport due to reasonable suspicion[,] . . . an object could clearly be seen inside [Plaintiff's] body."[139]

In his ARP submitted shortly after the March 16 incident, Plaintiff directly disputes Defendant Williams' statements regarding the evidentiary basis of his reasonable suspicion for detaining Plaintiff in the dry cell.[140] Further, in the instant motion, Plaintiff contends the lost video footage from other cameras in the Wind 3 Dorm "would clearly show that it was absurd to suggest he had reached his hand down the back of his pant to his rectum and inserted an object while in a room with multiple other inmates and not one of them taking any notice."[141] Plaintiff argues the one produced video from Wind 3 Dorm Rear "does not show [Plaintiff] removing anything from pockets or reaching into the back of his pants,"[142] "but the spoliated collateral videos" would likely prove Plaintiff "returned to his bed, took [] tobacco out of his pocket and placed three cans in his locker and one in his pocket."[143] Plaintiff argues the lost March 16 body scans are similarly relevant because they would demonstrate "there was nothing . . . to justify placing [Plaintiff] in a dry cell for the better part of a week."[144]

The Court agrees that Defendants' failure to preserve relevant "collateral" video footage and body scans has prejudiced Plaintiff from presenting evidence essential to

---

[138] *Id.* at p. 2 (citing March 16 UOR, R. Doc. 46-3 at p. 6).

[139] *Id.* (citing March 16 UOR, R. Doc. 46-3 at p. 6 (noting also that "[a] DVR Request was submitted to save the video footage")).

[140] In the ARP, Plaintiff declares he heard Defendant Williams say: "[Plaintiff] put something in his rectum . . . [w]ell I didn't see it, the locker was in the way, but that is what it looked like." April 2 ARP, R. Doc. 46-12 at p. 1. The ARP further provides that in response to Defendant Williams' allegation, Plaintiff replied: "You have got to be kidding me. I'd like to see that on camera." March 21 ARP, R. Doc. 46-13 at p. 4.

[141] R. Doc. 83-2 at p. 9.

[142] R. Doc. 46-2 at pp. 5–6.

[143] R. Doc. 78 at p. 4.

[144] R. Doc. 83-2 at p. 9.

challenge Defendants' assertion that the existing videos and body scans gave them the reasonable suspicion required to detain Plaintiff in the dry cell.

### III. Evidence exists that may support an inference that Defendants acted with the intent to deprive Plaintiff of the lost ESI's use in this litigation.

Because Plaintiff established that Rule 37(e)'s four predicate elements exist and the loss of the ESI prejudices Plaintiff, the Court turns to assessing whether Defendants acted with the intent to deprive Plaintiff of the lost ESI's use in this litigation.[145] As the party alleging his adversary should have preserved ESI, Plaintiff bears the burden of proving Defendants acted with the requisite intent under Rule 37(e)(2).[146] "The 2015 advisory committee notes to Rule 37(e) explicitly reject prior caselaw that permitted an adverse-inference instruction 'on a finding of negligence or gross negligence.'"[147] "Instead, a party must prove 'actual intent'"[148] by either direct evidence or by inference from a "strong chain of circumstantial evidence."[149]

The few courts in the Fifth Circuit that have considered whether a party acted with the intent to deprive their adversary of the use of lost ESI in litigation under Rule 37(e) analogize the standard to the "bad faith" standard for a finding of spoliation.[150] "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence."[151] Indeed, "bad faith means more than mere bad judgment or negligence, it

---

[145] *See* FED. R. CIV. P. 37(e)(2).

[146] *See Grant*, 2020 WL 1864857, at *8.

[147] *Id.* at *11 (citing FED. R. CIV. P. 37(e), Advisory Comm. Notes, 2015).

[148] *Id.* (citing *Itron, Inc. v. Johnston*, 15-330, 2017 WL 11372353, at *2 (S.D. Miss. Oct. 26, 2017)).

[149] *See Ashton*, 772 F. Supp. 2d at 795, 802-04.

[150] *See Ford v. Anderson Cnty.*, 90 F. 4th 736, 767-68 (5th Cir. 2024) (finding no bad faith sufficient to warrant sanctions under Rule 37(e)(2) for lost text messages); *Falkins*, 21-1749, R. Doc. 42 at p. 16 (finding no bad faith to warrant an adverse inference instruction under Rule 37(e)(2) for lost video footage); *see also Jim S. Adler*, 2023 WL 2699511, at *21 ("[T]he Fifth Circuit's only decision [at the time] citing or applying amended Rule 37(e) laid out the 'bad faith' and Rule 37(e)(2) 'intent to deprive' standards together, suggesting in that unpublished decision that, for ESI spoliation, they overlap or even are interchangeable." (citing *Eagan v. Walgreen Co.*, 21-20352, 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022))).

[151] *Guzman*, 804 F.3d at 713.

implies the conscious doing of a wrong for dishonest or morally questionable motives."[152] "Typically, the court does not draw an inference of bad faith when the documents are destroyed under a routine policy."[153] "[T]he mere potential loss of evidence as a result of failure to properly institute and effectuate a litigation hold does not rise to the level of bad faith and willful misconduct necessary to support spoliation sanctions under the court's inherent power."[154] However, "bad faith may be inferred by evidence that a party has misrepresented the existence of documents or allowed the destruction of documents, and had explanations of spoliation that were not credible."[155] For example, courts have held that the failure "to direct employees to preserve evidence as requested in a hold letter,"[156] the fact that "documents were destroyed after [a defendant] had notice of their relevance to [a plaintiff's] claim,"[157] and "the selective preservation of relevant evidence in the face of imminent litigation can evince bad faith, even if destruction was pursuant to routine policy."[158]

Absent direct evidence, a "strong chain of circumstantial evidence" may be sufficient to establish bad faith.[159] For example, in *Rimkus Consulting Group, Inc. v. Cammarata*, the Southern District of Texas relied on only circumstantial evidence to

---

[152] *Thomas v. Tangipahoa Par. Sch. Bd.*, 14-2814, 2016 WL 3542286, at *2 (E.D. La. June 29, 2016).

[153] *Dixon*, 2014 WL 6087226, at *2 (citing *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).

[154] *Lou v. Lopinto*, 21-80, 2022 WL 16685539, at *8 (E.D. La. Nov. 2, 2022).

[155] *Id.* at *7.

[156] *Miramontes v. Peraton, Inc.*, 21-3019, 2023 WL 3855603, at *6 (N.D. Tex. June 6, 2023) (citing *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1280–81 (M.D. Fla. 2009)).

[157] *See Russell v. Univ. of Tex. of Permian Basin*, 234 Fed. App'x 195, 208 (5th Cir. 2007) ("Though we do not automatically draw an inference of bad faith simply because documents are destroyed after the initiation of litigation, [plaintiff] would have had a stronger argument for spoliation had she been able to prove that the documents were destroyed after [defendant] had notice of their relevance to her claim." (citations omitted)).

[158] *Miramontes*, 2023 WL 3855603, at *6 (citing *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004)); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 475-76 (E.D. Pa. 2020) ("Selective preservation can also reflect intent.").

[159] *Ashton*, 772 F. Supp. 2d at 795, 802-04.

conclude "defendants intentionally and in bad faith deleted [relevant] emails . . . to prevent the use of these emails in litigation."[160] In that case, the court determined circumstantial evidence was sufficient to support a finding of bad faith when evidence established "the defendants knew about the litigation . . . when they deleted the emails," offered inconsistent explanations for deleting the emails, failed "to disclose information about personal email accounts that were later revealed as having been used to obtain and disseminate information from [their adversary]," and when "some of the emails reveal[ed] what the defendants had previously denied."[161]

While document destruction under a routine policy does not always imply bad faith, a party "cannot blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy."[162] However, when there is no evidence that a party viewed video footage prior to its erasure, courts are reluctant to find that party acted in bad faith.[163] For example, in *Mixon v. Pohlman*, a court in this district considered whether defendants acted in bad faith when video surveillance footage of the first four days of the plaintiff's incarceration prior to his untimely death was overwritten subject to the prison's video retention practice.[164] The *Mixon* court found no bad faith when the detective conducting an investigation into plaintiff's death "ha[d] not wavered in her explanation that *she requested and viewed only* the October 28 video[,] [and] [t]here [wa]s no circumstantial evidence—let alone direct evidence—to counter her explanation that she believed only the October 28 video was necessary to her investigation."[165]

In this case, evidence exists from which the Court may infer that Defendant

---

[160] *Rimkus*, 688 F. Supp. 2d at 644.

[161] *Id.*

[162] *Lewy v. Remington Arms Co., Inc.*, 836 F.2d 1004, 1112 (8th Cir. 1988).

[163] *See, e.g., Schreane v. Beemon*, 575 Fed. App'x 486, 491 (5th Cir. 2014).

[164] *Mixon*, 2022 WL 2867091, at *9.

[165] *Id.* (emphasis added).

Williams reviewed video footage from several cameras on March 16, but selected video footage from only one camera for preservation.[166] Defendant Williams declared that he "reviewed video footage of Wind 3 Dorm Rear camera," and "[a]fter observing Plaintiff's actions from the Wind 3 Dorm Rear camera, [he] reported [his] observations to [his] supervisor who then approved for Plaintiff to be scanned at the body scanner."[167] Defendant Williams further declared that he "wrote an Unusual Occurrence Report and made a DVR Request of the Wind 3 TV Room camera footage and the Wind 3 Dorm Rear camera footage," because "[t]he Wind 3 Dorm Rear camera had the *best angle* of the incident involving Plaintiff."[168] Unlike the detective in *Mixon*, implicit in Defendant Williams' declaration is the inference that he reviewed video footage from all cameras in the Wind 3 Dorm when arriving at his suspicion that Plaintiff stored contraband in his rectum.[169] However, instead of requesting evidence from all cameras be preserved, he may have selectively preserved only that which he decided best supported his actions.[170] Even if Williams did not review the video footage from the other three cameras, it is clear he was aware that the video existed. Such selective preservation, especially "in the face of imminent litigation[,] can evince bad faith."[171]

Defendants contend the existing video evidence from the Wind 3 Dorm was selected for preservation because "the three other camera[s] [] either do not show

---

[166] *See* Declaration of Randall Williams, R. Doc. 67-2.

[167] *Id.* at p. 2; *see also* March 16 UOR, R. Doc. 46-3 at p. 6.

[168] Declaration of Randall Williams, R. Doc. 67-2 at pp. 2–3 (emphasis added); *see also* March 16 UOR, R. Doc. 46-3 at p. 6.

[169] Declaration of Randall Williams, R. Doc. 67-2 at pp. 2–3.

[170] *Id.*; *see also* March 16 UOR, R. Doc. 46-3 at p. 6.

[171] *See Miramontes*, 2023 WL 3855603, at *6 (citing *Stevenson*, 354 F.3d at 748) ("[T]he selective preservation of relevant evidence in the face of imminent litigation can evince bad faith, even if destruction was pursuant to routine policy.").

Plaintiff's bed (Rack 10) or have views obstructed by columns and/or fans."[172] Citing only to Defendant Williams' Declaration[173] and an exhibit containing still images from the surveillance cameras in the Wind 3 Dorm,[174] Defendants claim "it has . . . been *certified* that the other camera angles in Wind [3] [D]orm either did not capture the area where Plaintiff was located or were to[o] far away from Plaintiff and had potential obstructions that would [not] have added any value to what was observed by the Wind 3 [Dorm] Rear camera footage."[175] Plaintiff disputes this self-serving declaration by noting that "the beds in [the] Wind 3 [Dorm] are not bolted to the floor" and reasoning "[t]he photograph[s] do[] not show where the beds were on the date of the incident and are not evidence of what could have been seen" from the Wind 3 Dorm cameras on March 16, 2021.[176]

"[T]he mere fact that some [footage] was preserved and some was not does not necessarily amount to suspicious selective preservation" when there is an alternative explanation of why the video was preserved.[177] However, "bad faith may be inferred" when a party offers "explanations of spoliation that [are] not credible." [178] In this case, Defendants offered only a self-serving declaration that the other cameras in the Wind 3 Dorm "would [not] have added any value" to the footage that they selectively preserved.[179]

The Court has taken notice of several instances, since 2015, in which this district's courts have found RCC officials lost or destroyed ESI related to RCC inmates' civil rights

---

[172] R. Doc. 67 at pp. 3–4 (citing Photos of Wind 3 Dorm with arrows pointing to Rack 10, R. Doc. 67-3). In his reply, Plaintiff claims "[t]he photograph does not show where the beds were on the date of the incident and are not evidence of what could have been seen from the camera across from [Plaintiff's] bed" on March 16, 2021 because "the beds in the dorm are movable and not anchored to the floor." R. Doc. 78 at p. 5–6.
[173] Declaration of Randall Williams, R. Doc. 67-2.
[174] Photos of Wind 3 Dorm with arrows pointing to Rack 10, R. Doc. 67-3.
[175] R. Doc. 67 at p. 10 (emphasis added).
[176] R. Doc. 78 at pp. 5–6.
[177] *Bistrian*, 448 F. Supp. 3d at 476-77 (citing *Lokai Holdings LLC v. Twin Tiger USA LLC*, 15-9363, 2018 WL 1512055, at *16 (S.D.N.Y. Mar. 12, 2018)).
[178] *Lopinto*, 2022 WL 16685539, at *7.
[179] R. Doc. 67 at p. 10.

claims when the ESI should have been preserved.[180] For example, in *Falkins v. Goings*, an inmate alleged RCC officers "choke[d] and punch[ed] him, and kick[ed] him in his head and face, so that when he regained consciousness, his eyes were swollen shut; his ear, nose and mouth were bleeding; and a tooth had been knocked out."[181] The plaintiff "argu[ed] that relevant surveillance video footage was not produced and ha[d] [] been spoliated," and Magistrate Judge van Meerveld ultimately "found the existence of all four [Rule 37(e) predicate] elements, [which] justif[ied] [a] measure employed to cure the prejudice."[182] Similarly, in *Autin v. Goings*, an inmate claimed RCC officials "used excessive force on [him]" and argued the defendants spoliated video evidence by "only preserv[ing] video footage of his transport from one prison unit to another, without footage of the physical altercation within offices or spaces within the relevant prison locations."[183] District Judge Lemelle ultimately found the RCC officials "had a duty to preserve . . . video footage upon receiving plaintiff's ARP," and the record "establishe[d] negligence flowing from an unintentional failure of [DPSC] policy and prison officials to recognize that the filing of an ARP for excessive force . . . reasonably trigger[ed] the duty to preserve relevant evidence."[184] Further, although the spoliation claim was not fully adjudicated, in *McIntosh v. Goings*, an inmate alleged RCC officers assaulted him in October 2020 and "fail[ed] to preserve surveillance video of various parts of the use-of-force incidents."[185] Plaintiff argues these "[r]epeated instances of refusing to preserve evidence including video requested by inmates is not negligent bungling, [but instead,] it

---

[180] *Autin v. Goings*, 20-1214 (E.D. La.); *Falkins v. Goings*, 21-1749 (E.D. La.); *McIntosh v. Goings*, 21-1719 (E.D. La.).

[181] *Falkins*, 2022 WL 17414295, at *1.

[182] *Id.* at *1, 4.

[183] *Autin*, 20-1214, R. Doc. 61 at pp. 1, 4.

[184] *Id.* at pp. 6-7.

[185] *McIntosh v. Goings*, 22-30399, 2023 WL 5236857, at *1 (5th Cir. Aug. 15, 2023).

is bad faith."[186]

As discussed, even without direct evidence, bad faith may be established by a "strong chain of circumstantial evidence."[187] There is evidence from which the Court may infer that Defendants acted with the intent to deprive Plaintiff of the lost ESI's use in this litigation.[188] Accordingly, the Court will defer a determination of whether Defendants acted with the intent to deprive Plaintiff of the ESI's use in litigation.

**IV.    Rule 37 provides standards for determining sanctions.**

Under Rule 37(e)(1), upon a finding of "prejudice to another party from [the] loss of [ESI]," the Court "may order measures no greater than necessary to cure the prejudice."[189] When imposing sanctions under Rule 37(e)(1), "[t]he range of [curative] measures is quite broad" and "much is entrusted to the court's decision."[190]

> In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than [adverse inference instructions].[191]

Rule 37(e)(2) permits the Court to presume the lost ESI was unfavorable to the Defendants, "instruct the jury that it may or must presume" the lost ESI was unfavorable

---

[186] R. Doc. 83-2 at p. 4 (citing *Autin v. Goings*, 20-1214 (E.D. La.); *Falkins v. Goings*, 21-1749 (E.D. La.); *McIntosh v. Goings*, 21-1719 (E.D. La.)).
[187] *Ashton*, 772 F. Supp. 2d at 795, 802-04.
[188] Evidence that should be examined includes: (1) did Defendant Williams review video surveillance footage from four cameras in the Wind 3 Dorm and selectively preserve through his DVR request only that one which he decided best supported his actions; (2) even if he did not review the video footage from the other three cameras, did he know that the video footage existed; (3) is Defendants' explanation for selectively preserving the video surveillance footage self-serving and not credible; (4) did Defendants offer a credible explanation for mislabeling all body scans of Plaintiff on March 16, 2021, which Defendants claim to be the evidentiary basis of their suspicion for detaining Plaintiff in the dry cell; and (5) the DPSC has a disturbing pattern of conveniently losing evidence relevant to inmates' civil rights claims.
[189] FED. R. CIV. P. 37(e)(1).
[190] FED. R. CIV. P. 37(e), Advisory Comm. Notes, 2015.
[191] *Id.*

28

to the Defendants, or "dismiss the action or enter a default judgment."[192]

When choosing an appropriate sanction, the Fifth Circuit instructs district courts to consider:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.[193]

On the first and second considerations, the Court must repeat its finding that, by losing the scans, Defendants have deprived Plaintiff of the best and most compelling evidence of what actually happened on March 16, 2021. Additional camera footage and the March 16 body scans likely would have clarified the reasonableness of Defendants' suspicion. Accordingly, Plaintiff's prejudice is immense. On the third consideration, as discussed, the DPSC has a disturbing pattern of conveniently *losing* evidence relevant to RCC inmates' civil rights claims. The Court has taken judicial notice of three instances, since 2015, in which RCC inmates claim RCC officials lost or destroyed ESI related to their civil rights claims when the ESI should have been preserved.[194] Sanctions may be imposed to deter such conduct in the future.[195]

## V.   The Court will allow Plaintiff to present evidence and argument to the jury that Defendants failed to preserve ESI.

Plaintiff has demonstrated that Defendants' loss of the ESI has caused him prejudice. Accordingly, the Court may impose sanctions under Rule 37(e)(1).[196] Given the unique and vital nature of the lost ESI, the Court will order sanctions permitted under

---

[192] FED. R. CIV. P. 37(e)(1).

[193] *Coastal Bridge Co.*, 833 Fed. App'x at 573 (citing *Menges v. Cliffs Drilling Co.*, 99-2159, 2000 WL 765082, at *1 (E.D. La. June 12, 2000)).

[194] *Autin v. Goings*, 20-1214 (E.D. La.); *Falkins v. Goings*, 21-1749 (E.D. La.); *McIntosh v. Goings*, 21-1719 (E.D. La.).

[195] *See Coastal Bridge Co.*, 833 Fed. App'x at 573.

[196] FED. R. CIV. P. 37(e)(1) & (2).

Rule 37(e)(1) for Defendants' destruction of or failure to preserve the video footage and March 16 body scans. The Court will order the following:

- The Court will allow Plaintiff to present evidence and argument to the jury regarding the loss of the ESI after notice of the request for preservation was received;

- The Court will instruct the jury that the Defendants were under a duty to preserve the ESI but failed to do so; and

- The Court will preclude the Defendants from relying on any video footage or body scans collected on March 16, 2021, to support an argument that they had reasonable suspicion concerning Plaintiff's hiding of contraband in his rectum. [197]

The Court finds these sanctions are necessary, but not greater than necessary, to cure the significant prejudice Plaintiff has experienced as a result of Defendants' failure to preserve ESI that should have been preserved and to deter such conduct by the RCC in the future.

### VI.    The Court will defer a determination on Rule 37(e)(2) sanctions.

The Court will defer a determination of whether Rule 37(e)(2) sanctions are appropriate and, if so, what instructions will be given to the jury.[198] "Courts have noted that this approach affords the district judge with flexibility to determine the scope of the spoliation evidence to be presented at trial, including any argument that may be made to the jury on this issue, and to craft any related jury instructions on a full evidentiary record."[199]

---

[197] *See Jenkins v. Woody*, 15-355, 2017 WL 362475, at *18 (E.D. Va. 2017).
[198] The Court expects the parties will brief the issue in connection with the final jury instructions.
[199] *Jim S. Adler*, 2023 WL 2699511, at *21 (quoting *Wilson v. HH Savannah, LLC*, 420-217, 2022 WL 3273714, at *2 (S.D. Ga. July 28, 2022)).

## VII.   The Court will award attorneys' fees to the Plaintiff.

The Court also will order Defendants to pay Plaintiff the reasonable attorneys' fees and costs he has incurred thus far in having his attorney draft and file his motion to compel,[200] Rule 37(e) Motion,[201] and his appeal of Magistrate Judge Currault's ruling on the Rule 37(e) Motion.[202]

Plaintiff must file an application for attorneys' fees that is accompanied by supporting evidence establishing the amount of the reasonable attorneys' fees and costs to be awarded by **April 22, 2024**. The fee application must be supported by documentation evidencing the "lodestar" calculation, including affidavits and detailed billing records, and citations to relevant authorities and must set forth the itemized number of hours expended in connection with the recoverable attorneys' fees described above as well as the reasonable rate(s) requested.[203]

Defendants must file any response to the application by **May 6, 2024**, and Plaintiff must file any reply by **May 10, 2024**.

## <u>CONCLUSION</u>

**IT IS ORDERED** that Plaintiff's Motion for Review is **GRANTED**.[204]

**IT IS FURTHER ORDERED** that Magistrate Judge Currault's September 1, 2023 Order is **REVERSED**.[205] Electronically stored information that should have been preserved in the anticipation of litigation was lost because Defendants failed to take

---

[200] R. Doc. 21.
[201] R. Doc. 46.
[202] R. Doc. 83. Plaintiff may seek attorneys' fees regarding Rule 37(e)(2) sanctions in the event they are imposed.
[203] *See generally Tollett v. City of Kemah*, 285 F.3d 357, 367 (5th Cir. 2002).
[204] R. Doc. 83.
[205] R. Doc. 80.

reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery; further, the loss of the ESI prejudices Plaintiff.

**IT IS FURTHER ORDERED** that the Court **DEFERS** determination of whether Rule 37(e)(2) sanctions are appropriate and, if so, what instructions will be given to the jury.

**IT IS FURTHER ORDERED** that the Court will impose the following sanctions under Rule 37(e)(1):

- The Court will allow Plaintiff to present evidence and argument to the jury regarding the loss of the ESI;

- The Court will instruct the jury that the Defendants were under a duty to preserve the ESI but failed to do so; and

- The Court will preclude the Defendants from relying on any video footage or body scans collected on March 16, 2021, to support an argument that they had reasonable suspicion concerning Plaintiff.

**IT IS FURTHER ORDERED** that Defendants pay Plaintiff the reasonable attorneys' fees and costs he has incurred thus far in having his attorney draft and file his motion to compel,[206] Rule 37(e) Motion,[207] and his appeal of Magistrate Judge Currault's ruling on the Rule 37(e) Motion.[208]

**New Orleans, Louisiana, this 9th day of April, 2024.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[206] R. Doc. 21.
[207] R. Doc. 46.
[208] R. Doc. 83. Plaintiff must file an application for attorneys' fees that is accompanied by supporting evidence establishing the amount of the reasonable attorneys' fees and costs to be awarded by April 22, 2024. Defendants must file any response to the application by May 6, 2024, and Plaintiff must file any reply by May 10, 2024.